DECISION AND JUDGMENT ENTRY
Appellant, The Parry Company, Inc., appeals from a judgment of the Ross County Court of Common Pleas that denied its motion for attorney fees and sets forth the following assignments of error:
 "I. The trial court erred in denying Plaintiff attorneys' fees where Plaintiff proved by clear and convincing evidence that Defendant acted with actual malice toward Plaintiff and committed egregious fraud upon Plaintiff and where Plaintiff was awarded punitive damages.
 "II. The trial court erred in denying Plaintiff attorneys' fees where the punitive damages award is insufficient to serve both as a deterrent and to compensate Plaintiff Rendered on its attorneys' fees."
Appellee, Ryan J. Carter, has filed a cross-appeal and sets forth the following assignment of error:
 "THE TRIAL COURT'S AWARD OF PUNITIVE DAMAGES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
The Parry Company is in the business of providing high-grade sand and gravel for use in filtering water. The business was apparently operated successfully by David Parry until his death, when it was inherited by his wife, Phyllis Parry. At the time of the events pertinent to this decision, the directors of The Parry Company were Phyllis Parry, Cassandra Bolt (now Cassandra Bolt-Meredith), David Meredith, husband of Cassandra Bolt, and appellee, Ryan Carter. Because Mrs. Parry had no interest in operating the business and her daughter, Judge Cassandra Bolt-Meredith, was unable to do so because of ethical constraints, a decision was made to hire a business manager. Between 1992 and 1995, the company employed three different business managers.
Carter was hired by Judge Bolt-Meredith in 1995. At the time, appellee was twenty-four years old and had a business degree from Wittenberg. Prior to being hired by appellant, appellee had only worked as a tennis instructor and sold advertisements for a city directory for the R.L. Polk Company. As the trial court noted:
 "* * * Carter * * * was brought aboard at the age of 24 and with little or no managerial experience, but an abundance of gumption. * * *"
At the time he was hired, Judge Bolt-Meredith testified:
 "JUDGE MEREDITH: He was told that he was to run the day to day business, anything out of the ordinary he was to get in touch with us.
 "MS. MOTES: Did you discuss what out of the ordinary was or did you think that was understood between the two of you?
 "JUDGE MEREDITH: Well, he had a degree in I believe business or accounting and out of the ordinary would be anything that I think we discussed was day to day business, anything that was other than day to day business." [Tr. at 157.]
On cross-examination, Judge Bolt-Meredith testified:
 "MR. RODEHEFFER: * * * I think your words were anything out of the ordinary course of business you need to contact me?
"JUDGE MEREDITH: Yes.
 "MR. RODEHEFFER: And your testimony is that you just assumed he knew what that meant and you assumed also that he would have learned what that meant in the degree that he got from Wittenberg College?
 "JUDGE MEREDITH: Yes. And I would assume that when you tell him it's from day to day business, not anything out of the ordinary day to day business, I think most people understand the word ordinary." [Tr. at 181.]
Carter was hired as a business manager and was later made a vice-president and was paid commissions in addition to his salary. Appellee's employment was terminated in March 1999. David Meredith testified that neither the Schrader loan nor the car lease, discussed in greater detail below, were the basis for Carter's termination. Rather, Meredith testified that, at his wife's request, he talked to Carter in February 1999 about restructuring his compensation package. During that conversation:
 "MR. MEREDITH: He [Carter] came in and he told me he said look he said if you guys are thinking about getting rid of me he said there's going to be a blood bath. He said I'm going to take all of these customers, start my own business and you're going to be finished here. That's basically the way the conversation went." [Tr. at 64.]
Meredith and his wife filed a complaint with the Ross County Sheriff and ended Carter's employment.
Appellant filed a complaint setting forth numerous allegations of misuse of company funds and seeking $300,000 in compensatory damages, $250,000 in punitive damages and attorney fees. Appellee filed a counterclaim alleging intentional infliction of emotional distress and defamation, and asked for $35,000 in damages. Although there is no entry in the record, apparently appellee dismissed his counterclaim.
Despite the numerous allegations of misconduct in the complaint, the issues at trial revolved around six specific events: the Schrader loan; a car lease; payment of health insurance for Trista Tipton; providing sand to DEVCO; two donations to appellee's tennis camp and payments for appellee's rental property.
As noted above, the primary business of The Parry Company was to process and sell high-grade sand and gravel to be used to purify water. All parties agree that it is a highly-competitive business. A local sand and gravel distributor, Best Company, either refused to sell its product to appellant or would sell only small amounts. As a result, appellant was purchasing coarse sand from R.W. Sidley, in Cleveland, at a cost of $12 per ton and paying shipping costs of $14 to $18 per ton.
In 1998, appellee was approached by Jeff Schrader, who leased property that had material which could be mined to provide a local source of supply of sand and gravel to meet the needs of both Schrader and appellant. Schrader, however, was in need of capital for equipment. On behalf of appellant, appellee negotiated a $100,000 loan with Fifth Third Bank at seventeen percent interest. Part of the proceeds of the loan, $20,000, were to be used to pay heirs of the David Parry estate. The balance was used to prepay Schrader for materials to be delivered to appellant. Although appellant remained responsible for payments on the loan, Schrader's debt to appellant was to be discharged based on the delivery of sand and gravel at pre-determined prices per ton. The trial court found the loan itself to be within appellee's scope of authority and that appellant benefited by having obtained a reliable source of supply at a lower discounted price. Because the trial court found appellant benefited from the loan, it did not address the questionable manner in which Mrs. Parry's signature was obtained.
The problem with the Schrader loan was not, however, the advance of $80,000 to Schrader to be paid back to the company by the delivery of sand and gravel, but, rather, the kickback arrangement between Schrader and appellee. As part of the agreement by Carter to arrange for a loan to The Parry Company, the proceeds of which were, in part, provided to Schrader, Schrader and appellee agreed between themselves that Schrader would pay The Parry Company fifteen cents for each ton of gravel delivered and ten cents per ton to appellee, personally. Likewise, Schrader agreed to pay The Parry Company fifteen cents per ton for gravel and to pay appellee personally fifteen cents per ton for gravel delivered. Appellee was paid approximately $3,800 pursuant to this arrangement. Although appellee attempted to characterize these payments as "a finder's fee," and "just something Jeff does for me," the trial court found such actions to be reprehensible and demonstrative of a hostile attitude toward appellant. (Tr. at 218, 39.) The trial court found appellant's damages from this kickback arrangement to be $5,000.
In 1997, appellee leased a car in his own name for use as a company car. The lease was in appellee's name because he did not have a corporate resolution in a form acceptable to the leasing company to sign a lease on behalf of appellant. The Parry Company paid for the lease, as well as insurance on the car. Appellant was aware of the lease, as payments were made from its office. Further, David Meredith had driven in the car and discussed the lease with his wife. The trial court found appellant failed to show more was expended on the lease than would have been spent reimbursing appellee for mileage for the use of his personal car and awarded no damages.
Trista Tipton was the former wife of appellee's cousin and had been employed as a secretary by The Parry Company. She left that employment to work with an attorney in Portsmouth, who agreed to reimburse The Parry Company for her insurance premiums in order to continue coverage for her as she had been diagnosed with ovarian cancer. Although the attorney failed to reimburse appellant because Tipton left his employment after a month, Carter authorized the continued payments for her insurance premiums which he thought the company was obligated to do under COBRA. Similar arrangements had been made in the past for another employee of appellant and, in fact, appellant continued to pay insurance premiums for appellee after he was terminated. The trial court found appellee was acting within his authority and consistent with past company policy in authorizing payments for Tipton's insurance.
In 1997, appellant gave DEVCO $360 worth of pool sand in exchange for a reduction in the cost of a swimming pool to be installed at appellee's home for his personal use. Despite appellee's attempts to characterize this arrangement as an attempt to introduce DEVCO to appellant's products in the hope of future business, it was clearly a misappropriation of appellant's property. The court found appellee liable to appellant for $360.
Appellee and his father operated a tennis camp for children in Portsmouth. Appellee, using The Parry Company funds, made two payments of $200 each to sponsor children at his tennis camp, which were paid into his personal account, without disclosing the payments to appellant. While the trial court found Carter liable to The Parry Company for $400, it found no malice because appellant had, and still does provide, some support for children's sports teams, as well as contributing sand and gravel to groups such as the Boy Scouts.
Last, appellee used $1,570.99 to make mortgage and insurance payments on rental property he personally owned in Columbus. Appellee testified he was experiencing cash flow problems and offset company funds he used to pay his personal debts by reducing the amount of his commissions. Appellee, however, had no records to document how any of his commissions were calculated, let alone that he reduced his commissions in order to pay the company back. The trial court correctly characterized this as a misappropriation of company funds and awarded appellant $1,570.99 in damages.
In addition to the award of $7,330 in compensatory damages, the trial court awarded $20,000 in punitive damages but declined to award attorney fees.
Neither party has appealed the underlying judgment. Rather, appellant argues it was entitled to attorney fees and appellee argues the record does not support an award of punitive damages.
We will address appellee's cross-appeal first. Appellee argues that he was young, inexperienced and, while he admittedly exercised poor judgment in running a company in which the owners had little interest, he did not demonstrate actual malice required for an award of punitive damages. We disagree.
The purpose of punitive damages is to punish a defendant for wrongful conduct and to deter such conduct in the future. Digital Analog DesignCorp. v. North Supply Co. (1992), 63 Ohio St.3d 657. The amount of such damages rests largely within the discretion of the trial court. Villellav. Waikem Motors, Inc. (1989), 45 Ohio St.3d 36. Such an award will generally not be reversed unless it bears no reasonable relationship or is so grossly disproportionate to the amount of compensatory damages that the award appears to be the result of passion or prejudice. Shore,Shirley Co. v. Kelley (1988), 40 Ohio App.3d 10.
In Preston v. Murty (1987), 32 Ohio St.3d 334, syllabus, the Ohio Supreme Court held:
 "Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm."
[Emphasis sic.]
Plaintiff has the burden of proof to establish actual malice by clear and convincing evidence. R.C. 2315.21(D)(2).
The issue is not whether this court would have awarded punitive damages, but whether the trial court erred in doing so. An employee owes his employer a duty to act in the utmost good faith and loyalty. Bergev. Columbus Community Cable Access (1999), 136 Ohio App.3d 281, citingConnelly v. Balkwill (1954), 160 Ohio St. 430.
Appellee failed in his duty of loyalty and good faith to appellant and, based on a review of the record, we find appellant proved actual malice in the sense of a disregard of the rights of others. While appellee seeks to explain away his behavior based on youth and inexperience, such conditions do not excuse his disdain for his employers or his treatment of their company as his own. He thought his employers stupid; felt free to negotiate contracts premised on kickbacks to his personal profit; gave away company property in order to obtain a personal benefit; and used company funds as his own without any thought to maintaining sufficient records to show an attempt to repay those funds, assuming arguendo such would be proper. Appellee's cross-appeal is overruled.
Appellant's assignments of error are related and will be addressed together. In its assignments of error, appellant argues that the trial court erred by failing to award attorney fees. We disagree. Within the confines of certain rules, trial courts enjoy a certain degree of flexibility in structuring damage awards in a manner most appropriate to the case before it. Rhodes v. Rhodes Indus., Inc. (1991),71 Ohio App.3d 797. In Digital Analog, at 664-665, the court stated:
 "* * * Although the general rule is that reasonable attorney fees may be awarded in an action where punitive damages have also been awarded, Columbus Finance, Inc. v. Howard (1975), 42 Ohio St.2d 178, 183, 71 O.O.2d 174, 177, 327 N.E.2d 654, 658, a trial court may decline to award any amount of attorney fees if the defendant upon whom such fees will be imposed successfully rebuts the presumption that reasonable fees should be awarded. Thus, a trial court may consider whether the punitive damages awarded are adequate both to compensate the plaintiff for his attorney fees and to fulfill the punitive and deterrent purpose of the exemplary damages awarded. If the court concludes that the punitive damages are sufficient to fulfill those purposes without the imposition of attorney fees, the court may decline to award such fees, even if a jury has determined that such fees should be awarded."
Appellant sought attorney fees in the amount of $21,942, based on 190.8 hours worked, billed at a rate of $115 per hour.
Although the trial court premised its decision on the parties' failure to settle early, noting "the issues not being that difficult," implicit in the trial court's decision is a finding that appellant was not without fault in setting into play various factors that gave rise to its claims. The court recognized that appellant hired a young individual with no experience in the day to day management of a business, with guidelines that were "[a]t best, * * * nebulous, especially for one new in management." To the extent that dicta in Digital Analog require a presumption of attorney fees to be rebutted, we find appellee did so. Judge Bolt-Meredith and her husband were aware of the Schrader loan, as well as the car lease, but never expressed their disapproval and tacitly acquiesced in these arrangements. Appellant never contacted Schrader or the bank to terminate the loan on the basis it was outside the scope of Carter's authority or renegotiate the loan on more favorable terms. The trial court found the loan itself benefited The Parry Company and appellant continued to make lease and insurance payments on the car after at least two company directors became aware of it. The insurance premiums for Tipton were paid through appellant's office and appellant should have been aware of them.
Of the $300,000 in compensatory damages appellant sought, the trial court awarded judgment for only $7,330. Appellant now has a judgment against him for $20,000 in punitive damages, which may not be discharged in bankruptcy. In re Sarff (Bankr.Ct.6, 2000), 242 B.R. 620.
We find appellant has been adequately compensated for any damages suffered as a result of appellee's actions and the trial court did not err in failing to award attorney fees.
For the foregoing reasons, appellant's assignments of error and appellee's assignment of error are overruled, and the judgment of Ross County Court of Common Pleas is affirmed.
Judgment affirmed.
TYACK, P.J., BOWMAN and LAZARUS, JJ., of the Tenth Appellate District, sitting by assignment in the Fourth Appellate District.